DENNISON (MARVIN v.). See Case No. 9,-180.

---

## Case No. 3,799.

### DENNISON et al. v. The WATAGA.

[11 Leg. Int. 7; 1 Phila. 468.]

District Court, E. D. Pennsylvania. 1854.

MARITIME CONTRACTS — CARRIAGE OF PASSENGERS — CONTRACT TO FORWARD.

[1. Certain passengers engaged with a ship-agent at Cork for passage to New York. The vessel in which it was proposed to carry them not being ready for sea, they were placed on board another ship, bound for Philadelphia; the agent giving each passenger a certificate engaging that he should be carried to Philadelphia on the latter ship, with a written indorsement that he should then be forwarded to New York free of expense. The master received these certificates from the passengers without dissenting from their provisions, and kept them until arrival at Philadelphia. There, however, he disclaimed further responsibility for the passengers. *Held*, that the contract was a maritime contract, made with apparent authority, and was binding on the ship.]

[2. The contract was an integral one, not separable as to the two stages of transportation; and therefore the ship was liable for the expense of forwarding the passengers to New York, whether she carried them herself, or caused them to be sent by another ship, or by land.]

KANE, District Judge. This case came before me in a summary form a few days ago, and was then decided; but the principles it involved were so important, that I have thought it best to have a record of my adjudication.

The libellants, in number more than a hundred, had engaged with a certain Brennan, ship-agent at Cork, in Ireland, for a passage to New York. Some of them had purchased tickets in the first instance, to sail direct to that port; but the vessel in which it was proposed to carry them, not being ready for sea, as soon as was desirable, Brennan chartered, as it is said, the "between decks" of the Wataga, a vessel then in port, and bound to Philadelphia; and gave to each of the libellants a certificate in the usual form, partly printed and partly written, by which he engaged that they should be carried to this city on board of her, with a written endorsement, that on her arrival here, they would be forwarded to New York free of expense. The libellants repaired on board the Wataga, bearing these certificates, exhibited them to the mate, who was for the time in command, and afterwards to the master, who took possession of them before the vessel sailed, and retained them until required, by the terms of the libel, to produce them before this court. On the arrival of the vessel at this port. it appears that the ship-agent, Brennan, had no representative here, and neither the master nor the consignees of the ship recognized any obligation to receive or forward the passengers. On the contrary, from the time that she was fastened to the wharf, the master ceased to issue rations or provide fires for cooking; and the party to whom, it is said, the ship-agent had written to act in his behalf, declined interfering, averring that he had never authorized Brennan to expect his aid. Two days after this, the passengers were induced to leave the ship and bring their baggage ashore, by the assurance that a steamer was waiting to convey them to New York. After carrying their chests, at their own expense, for a mile or more along the city wharves, they found that the steamer had gone without them. It does not, indeed, appear that any steamer or other means of conveyance had, at this time, ever been engaged for them, by the representatives of the ship-agent, or of the ship; but propositions to have the passengers carried forward had been made within an hour or two, to the proprietors of the steamer, by persons, who, disclaiming everything of legal obligation in the matter, protested that they were moved by charitable feelings alone. These propositions, moreover, being altogether conditional upon further notice, and never carried out into an engagement. The master, protesting a similar absence of liability, had sent after them a supply of food; but the steamer having set out before its arrival, it remained with the libellants. Men, women and children, crowded under an open shed on the pier, from before noon until after the city lamps were lighted for the night. Thus destitute, an appeal was made in their behalf to H. B. M.'s consul, to the mayor of the city, and to several citizens;

and by the charity of these, or some of them, the passengers obtained food and lodging. The next day this libel was filed, under the advice, as we have been given to understand, of Mr. Consul Mathew.

In considering the case, I threw out of my mind all reference to the asserted charter party. It was altogether res inter alios, and formed no part of the contract with the libellants. I found, then, an agreement made with them by a person who announced himself publicly as a ship-agent, and who was proved to have been in communication with the master of the ship; this agreement, made with apparent authority from the master or his owners, since under it the passengers were received on board, and transported to Philadelphia; and the certificate or ticket which expressed its terms having passed into the master's possession before the vessel left her harbor of Cork, and retained by him ever since, without his controverting or disaffirming it in any respect or degree. I had no difficulty upon this aspect of the facts, in considering these agreements as made with his concurrence, and therefore, binding as the acts of the master. I held also, that this, being a contract for transportation to a place beyond sea, and for diet during the voyage, was a maritime contract, and that as such, according to the repeated adjudications and established practice of the courts in this and the adjoining district, it was a proper subject of the admiralty jurisdiction. See The Aberfoyle [Case No. 17]; The Pacific [Id. 10,643]; The Achsah [Id. 10,586]; M'Afee v. The Creole [Id. 8,655]; and other cases in this court. The contract I treated as an integral one; the indorsement having as much effect as the part which was written or printed on the face; the parties, the consideration, the object, altogether one throughout. And inasmuch as it was not set out in any part of the instrument whether the distance between Philadelphia and New York was to be traversed by the same ship or by another, or by steamers, or on the open sea, or through a canal, or even by railroad, I held it to be only the closing stage of the transportation contracted for. As such it was binding on the ship, not capable of being divided up into parcels involving distinct and limited obligations, but as one single integral liability. Had even the certificate or ticket set out that the vehicle was not to continue the same, I should have likened the case, I said, to that of goods shipped to or from Bremen, which are for convenience carried by lighters, between Bremen and Bremerhaven, where, as we decided some months ago, the ship is bound for the safety and despatch of the subsidiary conveyance—to that of passengers, a familiar one some years ago, who engaged for the voyage from Europe to Wilmington, in Delaware, thence to be conveyed by steamer to Philadelphia—to the contract for passage from England via Halifax to New York, when the line of steamers was interrupted

at the former port—and to the great variety of cases, familiar in the contracts of commercial men, where shipments are made for places not directly accessible to the ordinary class of seafaring vessels—in all of which I suppose the ship to be bound for the delivery of the goods at the place mentioned in the bill of lading. In a word I ascertained it to be the law, that a contract, legal in its terms, and to be performed principally on the ocean, could be enforced against the ship, although the alleged breach of its provisions occurred in port. I think this may be fairly deduced from the adjudications I have already referred to in a neighboring district. But unless I am mistaken, it may be traced back in principle to a period earlier than the Roman Code. It was the necessitas navigatium, the exigencies of maritime commerce, precluding inquiry, for the most part, into the ownership of the vessel or the authority of the master, which implied a liability as under contract from the simple acceptance of the goods on board for carriage. Dig. bk. 14, T. 1, "De Exercitatoria Actione," § 5. It is not till within the 18th century, that the books speak of this liability as restricted in amount to the value of the vessel and her freight; though from some of the analogies which are traceable between it and the qualified liability of owners for the unauthorized acts of their servants, I do not doubt that the equity, which entered so largely into the administration of the Roman Law, must have introduced the limitation practically, at an earlier day. The oldest compilations that have come to us of the customs of the sea, regard the goods as bound in the nature of a privilegium for their freight (Judgments of Oleron, art. 34), and require that the goods, though landed at the port of destination, shall be protected there at the primary charge of the ship, until their delivery to the owner (Arts. Pardessus' Numeration); and Cleirac ("Res et Contumes," 24, 34) affirms that this privilegium is reciprocal between the ship and the cargo.

Now, it would be easy to show that the agreement in favor of the specific liability, as deducible from either the Digest, or the, perhaps, less ancient laws of the sea, applies with equal force and clearness to all the obligations which were contracted in the case before me. The Roman Law held, that goods on their way in lighters from the ships in the place of delivery, retained their rights against the remaining interests for an average loss (Dig. bk. 14, 1, 2, Fr. 4, "De Jaetu"); and that goods when so transhipped still remained at the risk of the vessel (Dig. bk. 19, T. 2, Fr. 13, § 1, "Locat. Conduct"). The articles I have referred to from the Judgments of Oleron (articles 24 and 34) show a continuing liability, even after the voyage has been terminated and the goods have been landed. The import of them both, and of many other provisions that are found in the books, is merely this, that the shipper, when

he places his goods in a vessel under a contract for transportation, is not to be embarrassed by questions of ownership or authority, or purposes of which he knows nothing. He trusts what he sees. If even the person who receives them on board was not constituted by the owner of the ship; if even the master's orders from his owners were that he should admit no substitute in his place; nay, even if they prohibited specially the substitution of that particular person, who was found acting on board; the rights of the innocent shippers without notice were held not to be affected. De Exercit. Act. loc. cit. The reason of it all is found in the policy of facilitating maritime commerce, ("producendum ubilitatem navigantium.")

The reason then applies to all contracts of transportation and to all portions of such contracts, whether made or sanctioned by the master, as it might be reasonably supposed that he was authorized to enter into on the ship's behalf; not merely to such as were to be executed on board the ships, for we have seen that the Roman law extends the principle to the case of goods in lighters, and of goods landed but not delivered; and so did the Laws of Oleron. The question narrows itself down to this: Was the particular contract, which claims as incidental to it a hypothecation of the vessel, such as might be reasonable, regarded to be without the authority of the party professing to make it? Now, as the hypothecation, in the ordinary case of affreightment, is the one most frequently and familiarly noticed in the books, and as its incidents, so far as regards the ships, are the same as those of the passenger contract, I will consider for the moment that the case before me was one of the ordinary sort, for the carriage of goods. Suppose then a contract such as is disclosed in the facts before me, but for the carriage of goods— goods to be transported by ships from Cork to Philadelphia, and thence forwarded to New York—a gross freight reserved for the entire service. In such a case, it is plain that the freight would be payable only at New York, not susceptible of pro rata apportionment at the will of the carrier. It must be the same with the privilegium, or security for its payment. We cannot apprehend such a thing as a security for an accruing debt, only incapable of enforcement at once because the liability has not yet been fully matured, which must necessarily be invalidated and become null by consummation of the liability. The implied liability of the goods to the ship must subsist therefore in the case I have supposed till the entire contract has been perfected; that is to say, till the goods reach New York and the freight is paid for the entire carriage. But the lien of the ship and goods being mutual and reciprocal, why should not the hypothecation of the ship to the goods be equally enduring with that of the goods to the ship? Where is the principle, or the statute, or the case, that, professing to recognize mutual and reciprocal securities, between two parties to a contract, divides the liability of one party into segments, and attaches the security to one of those segments only; yet leaves the other's liabilities integral, and its security integral also? And if this argument would dispose of the question, supposing it to be one of the ordinary affreightment of goods, we must rescind all our adjudications on passenger contracts, and disregard those made in other districts, or we must hold the same law applicable to passenger contracts, and the Wataga therefore liable for the entire performance of her contract.

Passing from this discussion, into which I could scarcely enter the other day, to the question of damages. I observed that the admiralty is not the appropriate forum of vindictive justice. Our object here is rarely to do more than indemnify the party who has been aggrieved. This we have heretofore sought to do, in the case of The Creole [supra] and others, where the breach complained of presented no aggravating circumstances, by treating the passenger contract as rescinded, and allowing each passenger to receive back the amount he had paid, with a moderate allowance in addition for his necessary expenses while awaiting redress from this court. I made my decree accordingly, directing the commissioner to ascertain its amount. I will take care so to mould the further proceedings in the case, as to reimburse H. B. M.'s consul, and any others who have charitably intervened in behalf of these destitute emigrants, such sums as they have actually expended for their protection and support.